UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM CARL TYLER,

                        Plaintiff,                 Civil Action No. 12-14527
                                                 Honorable Sean F. Cox
                                                   Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                        Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [12, 14]

Plaintiff William Carl Tyler ("Tyler") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [12, 14], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

I.       **RECOMMENDATION**

For the reasons set forth below, the Court finds that the Administrative Law Judge's ("ALJ") conclusion that Tyler is not disabled under the Act is not supported by substantial evidence. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [14] be DENIED, Tyler's Motion for Summary Judgment [12] be GRANTED IN PART to the extent it seeks remand and DENIED IN PART to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. §405(g), this case be REMANDED to the ALJ for further proceedings consistent with this Recommendation.

II.     **REPORT**

A.     **Procedural History**

On February 4, 2009, Tyler filed an application for SSI, alleging a disability onset date of July 1, 2008.  (Tr. 115-17).  This application was denied initially on August 20, 2009.  (Tr. 57-60).  Tyler filed a timely request for an administrative hearing, which was held on August 11, 2010, before ALJ Theodore Grippo.  (Tr. 27-54).  Tyler, who was represented by attorney William Watkinson, testified at the hearing, as did vocational expert Elizabeth Pasikowski.  (Tr. 31-52).  On May 27, 2011, the ALJ issued a written decision finding that Tyler is not disabled.  (Tr. 10-22).  On August 21, 2012, the Appeals Council denied review.  (Tr. 1-4).  Tyler filed for judicial review of the final decision on October 12, 2012.  (Doc. #1).

B.     **Background**

1.     *Disability Reports*

In a February 4, 2009 disability field office report, Tyler reported that his alleged onset date was July 1, 2008.  (Tr. 125).  The claims examiner noted that, during a face-to-face interview, Tyler had difficulty concentrating and with coherency.  (Tr. 126).  Tyler was accompanied to this interview by his wife, which was "really helpful," because he "could not remember a lot of information" and stated that his reading and writing skills were at about a third grade level.  (*Id.*).

In an undated disability report, Tyler indicated that his ability to work is limited by "mental health," stomach problems, surgeries, twisted bowel syndrome, and blackouts.  (Tr. 129).  Tyler reported that these conditions first interfered with his ability to work on July 1, 2006, and that he has not worked since that time.  (*Id.*).  According to Tyler, he stopped working because he had a "nervous break down."  (*Id.*).

Tyler completed the eighth grade – taking special education classes – but had no further

education.  (Tr. 133).  Prior to stopping work, Tyler worked as a truck driver.  (Tr. 129).  In that job, he was required to walk, climb, and kneel one hour per day, and sit three hours per day. (*Id.*).  He was required to lift less than 10 pounds.  (*Id.*).

Tyler indicated that he had treated with doctors regarding his physical impairments and "mental illness."  (Tr. 131-32).  At the time of the report, he was taking medications for depression and to help him sleep.  (Tr. 132).  He further indicated that he had undergone a psychiatric evaluation with Dr. Sudhir Lingnukar in January of 2008.[1]  (Tr. 133).

In a function report dated March 11, 2009, Tyler indicated that his daily activities include drinking coffee, pacing the floor, watching television, taking his medication, and then going to bed.  (Tr. 152).  He is able to care for his dog.  (Tr. 153).  When asked to describe what he could do before the onset of his conditions that he can no longer do, Tyler indicated:  "get along with people."  (*Id.*).  His condition interferes with his sleep:  even with medication, he sleeps only three or four hours per night.  (*Id.*).  He does not have any difficulties with personal care but sometimes needs reminders to take medication.  (Tr. 154).  Tyler prepares his own meals (cereal or sandwiches) on a daily basis.  (*Id.*).  He is able to take out the trash, although he needs to be reminded.  (*Id.*).  He goes outside every day and is able to drive a car.  (Tr. 155).  He goes grocery shopping once a month, but he is unable to pay bills, use a checkbook, or handle a savings account.  (*Id.*).  His hobbies include watching television, which he does "all day every day."  (Tr. 156).  He tries to avoid spending time with other people, but he goes to doctors' appointments and counseling sessions "quite often."  (*Id.*).  He has trouble getting along with others because he has a "very short temper," and he gets irritated in large crowds.  (Tr. 157).

When asked to identify functions impacted by his condition, Tyler checked sitting,

---

[1] There is no evidence of this psychiatric evaluation in the record.

3

talking, memory, completing tasks, concentration, following instructions, and getting along with others. (*Id.*). He does not finish what he starts, and does not follow written or spoken instructions well. (*Id.*). He does not get along well with authority figures and has been fired from jobs because of problems getting along with other people. (Tr. 158). He does not handle stress or changes in routine well, and he is afraid of being away from home. (*Id.*).

2.    *Tyler's Testimony*

At the time of the August 11, 2010 hearing before the ALJ, Tyler was just shy of 41 years old. (Tr. 31). He was 6'1" tall and weighed 210 pounds (down from a high of 420, following successful gastric bypass surgery). (Tr. 32). He had worked as a truck driver (hauling steel) for approximately eighteen months, stopping some time in 2008 because it was "just too much pain." (Tr. 32-33). Prior to 2007, however, Tyler never worked full-time; he testified that he tried "quite a few times," but was unable to "get along with bosses or take orders or [get] along with others." (Tr. 51-52).

From a physical perspective, Tyler testified that he injured his knee when he stepped in a hole and subsequently had surgery in December 2008. (Tr. 33-34). Following that surgery, he began physical therapy, which seemed to help until he slipped on ice, re-injuring the knee. (Tr. 34). From that point on, his knee started "giving out" from time to time; eventually, it gave out and he fell down a set of stairs, which required a second surgery in July 2009. (Tr. 34-35). After that surgery, Tyler began experiencing pain in his hips, which he believed was caused by having to spend so much time in a chair recovering from knee surgery. (Tr. 35). He also discovered that he "tore [his] rotator cuffs" when he fell down the stairs; however, his physician apparently will not treat his shoulder injuries until his knee and hip pain are resolved. (Tr. 35, 43). As a result of his hip and shoulder pain, he could no longer do physical therapy for his knee. (*Id.*).

4

Tyler testified that he uses a cane for stability; but, he cannot walk more than a block, he cannot walk on uneven ground, and he avoids steps "at all costs."  (Tr. 35-37).

Tyler further testified that, short of a knee replacement, there is nothing more that can be done from a surgical perspective.  (Tr. 36).  He testified that there is still "clicking," "popping," and pain in his knee, which he generally treats with ice or heat.  (Tr. 37).  His hips also cause him pain ("a constant ten" on the pain scale); he cannot sit or stand for too long; and he needs to lie down a couple of times during the day.  (Tr. 38, 41-42).  In addition, Tyler cannot raise his arms above his head and can lift only ten pounds.  (Tr. 43).  He has carpal tunnel in both hands and had surgery on his left elbow in 2008.  (Tr. 43).  He testified that if he uses his hands too much, they spasm and "hook" on him.  (Tr. 44).  Tyler testified that he tries to avoid taking pain medication, because he previously was addicted to Vicodin and other narcotic medications but successfully completed a treatment program.  (Tr. 38-39).  When asked what he was doing to control his physical pain, Tyler said, "I'm living with it."  (Tr. 40-41).

Tyler also testified that he suffers from anxiety, depression, anger, and mood swings. (Tr. 45).  He has had "concentration issues" his whole life, and he has two or three panic attacks per day (for which he takes medication).  (Tr. 46-47).  At the time of the hearing, Tyler was taking several medications prescribed by his psychiatrist, which included Depakote, Paxil, Inderal, trazodone, and Xanax.  (Tr. 40).

When asked what he does on a daily basis, Tyler testified that he tries to help his wife – who was, at the time of the hearing, eight months pregnant – "as much as [he] can" by doing light dusting, cleaning, cooking, and shopping.  (Tr. 47, 50).  However, Tyler spends most of the day sitting in his chair, lying in bed, or pacing the floor.  (Tr. 47).

3.    *Medical Evidence*

(a)    *Physical Impairments*

(1)    *Records Submitted at the Administrative Hearing*

The ALJ found that Tyler suffers from the severe physical impairments of status post right knee arthroscopy and ACL revision; degenerative arthritis and avascular necrosis of the bilateral hips; and tendinosis and joint arthropathy of the bilateral shoulders. (Tr. 12-13). The ALJ also found that Tyler's stomach problems, twisted bowel syndrome,[2] left ulnar nerve release,[3] encephalopathy, and West Nile virus[4] do not constitute severe impairments under the Act. (*Id.*). Medical evidence pertaining to Tyler's severe physical impairments is discussed below.

On October 20, 2008, Tyler stepped in a hole and injured his right knee. (Tr. 337). A November 7, 2008 MRI of Tyler's right knee showed a complete rupture of his anterior cruciate ligament ("ACL"). (Tr. 348). In addition, both menisci were torn. (*Id.*). Consequently, Dr. Dennis Kelly performed a right knee arthroscopy with resection and reconstruction of Tyler's ACL on December 22, 2008. (Tr. 331-32). By February 19, 2009, Tyler reported to Dr. Kelly that his ACL was feeling "fine," but he complained of hip pain. (Tr. 328). Upon examination, however, Tyler had excellent range of motion in his right knee and hip and good strength. (*Id.*).

---

[2] On January 15, 2009, Tyler had an exploratory laparotomy with reduction of internal hernia and closure of mensenteric defect. (Tr. 235). He did not have any complications from this surgery and was ambulatory on discharge. (Tr. 237).

[3] On November 5, 2008, as a result of severe left carpal tunnel syndrome, Tyler underwent a left ulnar nerve release with anterior subcutaneous transposition. (Tr. 342). After November 20, 2008, the record does not contain any subsequent complains of left hand numbness or symptoms related to the ulnar nerve release.

[4] After complaining of a severe headache and exhibiting mental status changes, Tyler was hospitalized from September 15-17, 2010. (Tr. 421). He was diagnosed with viral encephalopathy; after he was discharged, it was determined that this was caused by the West Nile virus. (Tr. 421-22, 434).

At a follow-up visit with Dr. Kelly on March 24, 2009, Tyler reported that he had fallen down the stairs and hyper-extended his knee.  (Tr. 324).  He had slight effusion and tenderness both medially and laterally.  (*Id.*).  At his next visit, on April 7, 2009, Tyler also complained of severe pain in both shoulders.  (Tr. 322).  Upon examination, the findings were "fairly benign," and x-rays of both shoulders were negative.  (*Id.*).

To further evaluate Tyler's complaints of shoulder pain, however, MRIs of both shoulders were performed on April 29, 2009.  (Tr. 314-16).  The MRI of Tyler's right shoulder revealed mild-to-moderate acromioclavicular joint arthropathy with some capsular hypertrophy, mild tendinosis, and some cystic changes compatible with osteoarthritis.  (Tr. 315).  The MRI of Tyler's left shoulder revealed a small paralabral cyst, which was "presumptive evidence [of] an inferior labral tear," degenerative changes, and mild acromioclavicular joint arthropathy.  (*Id.*).

Despite physical therapy, Tyler continued to complain of knee, hip, and shoulder pain. (Tr. 263).  Thus, an MRI of Tyler's right knee was performed on May 29, 2009, which revealed a torn ACL reconstruction graft.  (Tr. 308).  As a result, Tyler underwent right ACL revision surgery on July 27, 2009.  (Tr. 261).  When he started physical therapy, on August 31, 2009, Tyler was still complaining of "constant pain," experiencing swelling and stiffness, and having difficulty walking and stair climbing.  (Tr. 301).

While rehabbing his knee,[5] Tyler continued to complain of severe pain in both hips.  (Tr. 300).  An MRI of Tyler's pelvis, performed on October 20, 2009, revealed avascular necrosis ("AVN")[6] at both femoral heads, but this appeared to be in the early stage, and there was no

---

[5] On October 21, 2009, Tyler was discharged from physical therapy after thirteen treatment sessions, having shown "minimal to no improvements."  (Tr. 292).  He was advised to consult further with his physician.  (*Id.*).

[6] AVN is the death of bone tissue due to impaired or disrupted blood supply (as that caused by traumatic injury or disease) and marked by severe pain in the affected region and by weakened

conspicuous marrow edema or femoral head collapse. (Tr. 293). On October 22, 2009, Dr. Kelly advised Tyler that this was "a serious problem" and that he might eventually need hip surgery, including decompression. (Tr. 298). He was placed on Fosamax, which had been found helpful in preventing "systemic collapse." (*Id.*). That same day, Dr. Kelly completed a Medical Source Statement, in which he opined that Tyler could lift less than ten pounds; stand and/or walk for less than two hours in an eight-hour workday; and sit for less than six hours in an eight-hour work day (alternating between sitting and standing). (Tr. 391-92). In addition, Dr. Kelly opined that Tyler was limited in pushing and pulling with his upper and lower extremities, and could never climb, balance, kneel, crouch, crawl, stoop, or reach. (Tr. 392-93).

Tyler saw Dr. Kelly on November 12, 2009, at which time hip surgery was again discussed. (Tr. 288). That day, Tyler had symptoms only on the right side, but he had not been taking Fosamax as prescribed. (*Id.*). At his next visit to Dr. Kelly, on February 18, 2010, Tyler indicated no real change in his hip pain. (*Id.*). He again indicated that he had stopped taking Fosamax, and Dr. Kelly advised him that it was important to take this medication "to prevent collapse of the areas of AVN." (*Id.*). X-rays of Tyler's hips demonstrated no sign of chondral collapse, and the articular surface appeared congruent. (*Id.*).

On July 24, 2010, Tyler underwent MRIs of his bilateral hips, which did not show any changes from the October 20, 2009 MRI, but AVN was still "strongly suspected." (Tr. 402-03). And, another MRI of Tyler's right knee was performed on August 18, 2010, which showed a complete re-tear of the previously repaired ACL, as well as cystic degeneration of the femoral tunnel. (Tr. 399). Progress notes from Tyler's next visit to Dr. Kelly read as follows:

> Follow up. Reviewed his MRI, which again demonstrates apparent failure of his ACL. Having symptoms of occasional instability. We discussed

---

bone that may flatten and collapse. *See http://www.merriam-webster.com.*

> therapy, he has other serious problems.  He is medically disabled.  He has
> bilateral shoulder SLAP tears, bilateral hip AVN and his knee and
> additionally his wife is expect[ing] next 2-3 weeks.  We did talk about and
> give him an Rx for PT, follow up appointment made.  We also gave him
> the name of a pain management.  He had previous problems with narcotic
> usage.  With all the underlying problems he will probably require
> something.

(Tr. 398).

On November 3, 2010, Tyler underwent a consultative physical examination with Clifford Buchman, D.O.  (Tr. 406-18).  Tyler complained of pain, buckling, and occasional swelling in his right knee.  (Tr. 407).  He also indicated that his left shoulder was more symptomatic than his right, and he cannot lift, pull, or push.  (*Id.*).  His grip strength was 110 on the right and 60 on the left, and he had positive shoulder impingement (greater on the left than the right).  (Tr. 408).  Tyler also exhibited decreased flexion and rotation of the right hip.  (Tr. 409).  According to Dr. Buchman, Tyler's right knee appeared stable.  (*Id.*).  Dr. Buchman diagnosed Tyler with early degenerative changes of both hips with AVN; status post arthroscopic surgical repair of the right knee, with stiffness, loss of motion, and continued pain; and shoulder pain bilaterally with signs of internal derangement.  (*Id.*).  However, Dr. Buchman opined that Tyler could occasionally lift up to fifty pounds; could sit for six hours, stand for four hours, and walk for two hours in an eight-hour workday; and required the use of a cane to ambulate.  (Tr. 411-12).  In addition, Dr. Buchman opined that Tyler could occasionally reach overhead with both hands; could never climb stairs, ramps, ladders, or scaffolds, stoop, kneel, crouch, or crawl; and had no limitation in pushing/pulling or operating foot controls.  (Tr. 413-14).

### (2)   *Records Submitted to the Appeals Council*

The administrative record also contains evidence regarding Tyler's physical impairments that was first submitted to the Appeals Council after the ALJ issued his decision in this case. That evidence is discussed below.

9

On March 24, 2011, Tyler returned to see Dr. Kelly, complaining of pain in both hips and both shoulders (with the left shoulder hurting worse than the right).  (Tr. 486).  At that point, Tyler had been off all narcotics for a year and a half, but stated that the "pain [was] incredible." (*Id.*).  With respect to Tyler's shoulders, Dr. Kelly noted that there was "MRI evidence of tearing and a cyst in the left shoulder," as well as some arthritic changes.  (*Id.*).  He was advised to schedule shoulder surgery and was prescribed Vicodin for pain.  (*Id.*).  At a follow-up visit to Dr. Kelly on June 14, 2011, Tyler again complained of bilateral hip and shoulder pain.  (Tr. 485). According to Dr. Kelly, Tyler had "bilateral SLAP tears and bilateral AVN of his hip."  (*Id.*). Tyler's prescriptions for Fosamax and Vicodin were renewed.  (*Id.*).

On July 7, 2011, Tyler underwent MRIs of both hips.  (Tr. 483-84).  The MRIs revealed: (1) bilateral femoral head AVN, with no evidence of subchondral collapse/fracture; (2) findings suspicious for left labral tearing anterosuperiorly and superiorly; (3) a small multilobulated ganglion-like structure projecting posteroinferiorly from the left hip joint; (4) mild right hamstring tendinosis and peritendinitis; and (5) trace free intraperitoneal fluid.  (Tr. 484).

At a follow-up visit on July 14, 2011, Dr. Kelly reviewed these MRI results and indicated that they "potentially show[] findings similar to that of one year ago."  (Tr. 482).  However, Tyler complained that his legs were going numb at times, and, on examination, he had a positive straight leg raising test.  (*Id.*).  Dr. Kelly suspected that Tyler had lumbar radiculopathy and scheduled him for a CT scan.  (*Id.*).  An EMG test conducted on July 22, 2011 showed evidence of lumbosacral polyradiculopathy, with the main involvement of L5 root.  (Tr. 498).  On March 16, 2012, Tyler underwent back surgery to repair foraminal disc herniation at L3-L4.  (Tr. 489). This surgery involved a laminectomy, facetectomy, and microdiskectomy at L3-L4 on the left and interbody fusion with screws.  (*Id.*).

10

(b)     Mental Impairments

The ALJ also concluded that Tyler suffers from the severe mental impairments of bipolar disorder, major depressive disorder, intermittent explosive disorder, antisocial personality disorder, and polysubstance dependence. (Tr. 12-13). Medical evidence pertaining to each of these conditions is discussed below.

On August 27, 2008, Tyler was admitted to St. John Macomb Oakland Hospital with complaints of major depression, suicidal ideation, and alcoholism. (Tr. 227). He reported that, after having gastric bypass surgery, he used opiates for approximately six months; when those ran out, he switched to alcohol and was, at the time of his hospitalization, consuming 12-24 beers and a fifth of liquor every day. (*Id.*). In addition, he tested positive for cannabis. (Tr. 231). On examination, Tyler was angry and irritable with a sad mood and depressed affect. (*Id.*). He was diagnosed with major depression and alcohol use disorder and assigned a Global Assessment of Functioning (GAF)[7] score of 35. (Tr. 231-32). Tyler received treatment in the hospital, and when he was discharged on August 29, 2008, his mood was "okay," his affect was normal, and his GAF score was 40.[8] (Tr. 233-34).

After his discharge, Tyler received follow-up treatment at Comprehensive Counseling Centers. At his early visits, he stated that he was "not doing okay." (Tr. 245-46). At an appointment on September 30, 2008, he was "using foul language in the waiting areas" and

_____

[7] GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations. *See White v. Commissioner of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

[8] The ALJ indicates in his decision that, at this time, Tyler's wife "believed that he was very functional (Exhibit 1F)." (Tr. 16). However, the relevant records actually state: "Apparently wife explains to [the doctor] that the patient is drinking a little more alcohol. He is a truck driver missing Fridays, sometimes Monday just not to go to work, with lot of alcohol on the breath. The patient's wife believes that he is a very functional." (Tr. 231). Read in context, then, it appears Tyler's wife believed him to be a "very functional alcoholic," not merely "very functional."

11

indicated that he had not been taking Depakote as prescribed.  (Tr. 245).  The next week, Tyler was very restless and irritated and felt that "nothing can help him."  (Tr. 244).  Tyler continued to feel "sad" and "down" over his next few visits, and on February 24, 2009, he was diagnosed with bipolar disorder.[9]  (Tr. 239).

On June 24, 2009, Tyler underwent a consultative psychological examination with Sung-Ran Cho, M.D.  (Tr. 249-53).  At the examination, Tyler was irritable and reported confusion, anger, crying spells, and difficulty concentrating.  (Tr. 249-51).  He also reported difficulty getting along with family members and people at work.  (Tr. 250).  At the time of the examination, Tyler was still drinking alcohol, smoking marijuana, and, occasionally, using cocaine.  (Id.).  His affect was anxious and irritable; however, his memory was intact.  (Tr. 250-51).  Dr. Cho diagnosed Tyler with polysubstance dependence disorder (currently using), intermittent explosive disorder, and antisocial personality disorder; assigned him a GAF score of 50 to 55; and described his prognosis as "poor."  (Tr. 252-53).

Tyler continued to receive treatment at Comprehensive Counseling Center and, on August 11, 2009, he reported feeling "very sad" about losing his job.  (Tr. 355).  At his next visit, on September 1, 2009, Tyler reported that he was "doing okay," but a decision was made to slowly increase his medication.  (Tr. 354).

On August 18, 2009, Dennis Beshara, M.D., reviewed Tyler's records and completed a Mental Residual Functional Capacity ("RFC") Assessment and a Psychiatric Review Technique.  (Tr. 264-77, 279-82).  Dr. Beshara noted that Tyler suffers from a personality disorder (as defined in Listing 12.08) and a substance addiction disorder (as defined in Listing 12.09).  (Tr.

---

[9] According to the ALJ, "By February 4, 2009, claimant reported doing okay (Exhibit 2F)."  (Tr. 16).  However, the progress notes from this visit indicate that Tyler indicated both that "he is doing okay" and that "he is not okay."  (Tr. 240).

264).   He opined that Tyler is mildly limited in his activities of daily living and social functioning, and moderately limited in maintaining concentration, persistence, or pace.[10]   (Tr. 274).   Dr. Beshara concluded, however, that Tyler retained sufficient mental functions for performing unskilled work.  (Tr. 281).

On June 28, 2010, Tyler had an initial evaluation at Easter Seals, where he began receiving mental health treatment.  (Tr. 368-85).  At that appointment, Tyler reported that he had stopped drinking in October of 2009, and was attending Alcoholics Anonymous meetings twice a day.  (Tr. 368).  His mood was stable, his affect was appropriate, and he was cooperative and forthcoming.  (*Id.*).  He reported experiencing depression, anxiety with panic attacks, anger, irritation, mood swings, racing thoughts, excessive worry, difficulty focusing, and difficulty sleeping.  (*Id.*).  Tyler was diagnosed with bipolar disorder and a history of polysubstance dependence.  (Tr. 374).

On August 9, 2010, Dr. K. Han, a psychiatrist at Easter Seals, submitted a Medical Source Statement.  (Tr. 357-59).  He diagnosed Tyler with major depression, recurrent, attention deficit hyperactivity disorder, panic disorder, and obsessive-compulsive disorder.  (Tr. 359). Dr. Han also indicated that Tyler suffered from severe anxiety, panic attacks, and difficulty

---

[10] Specifically, in his RFC Assessment, Dr. Beshara opined that Tyler is not significantly limited in his ability to remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; perform activities within a schedule and maintain regular attendance; sustain an ordinary routine without special supervision; make simple work-related decisions; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers without distracting them; maintain socially appropriate behavior; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others.  (Tr. 279-80).  Dr. Beshara further opined that Tyler is moderately limited in the ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; complete a normal workday and work week without interruptions from psychological symptoms; and respond appropriately to changes in the work setting.  (*Id.*).

13

concentrating.  (Tr. 357-58).  He further indicated that Tyler was angry and had a low tolerance

for frustration, which would affect his interaction with others.  (Tr. 358).  Dr. Han opined that

Tyler was markedly limited in the ability to understand, remember, and carry out detailed

instructions and to respond appropriately to work pressures in a usual work setting.  (Tr. 357-58).

He further opined that Tyler was moderately limited in the ability to understand, remember, and

carry out simple instructions, to make judgments on simple work-related decisions, to interact

appropriately with supervisors and co-workers, and to respond appropriately to changes in a

routine work setting.  (*Id.*).  According to Dr. Han, alcohol and substance abuse did not

contribute to Tyler's mental limitations, as he had stopped using substances in October of 2009.

(Tr. 358-59).

### 4.     *Vocational Expert's Testimony*

Elizabeth Pasikowski testified as an independent vocational expert ("VE") at the hearing

before the ALJ.  (Tr. 48).  The entirety of the VE's testimony is as follows:

> ALJ:   All right if you would please slowly give me his past relevant
> work?
>
> VE:    As a Driver, DOT 905.663-014, specific vocational preparation
> SVP 4, semiskilled medium.  Looking at exhibit 2d, it appears that
> that's the only 2d, page 5; that's the only thing that rose to a SGA.

(*Id.*).

## C.     **Framework for Disability Determinations**

Under the Act, SSI is available only for those who have a "disability."  *See Colvin v.*

*Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can be
> expected to result in death or which has lasted or can be expected to last
> for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be

determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps ….  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.    The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Tyler is not disabled under the Act.  At Step One, the ALJ found that Tyler has not engaged in substantial gainful activity since February 4, 2009, the application date.  (Tr. 12).  At Step Two, the ALJ found that Tyler has the severe impairments of status post right knee arthroscopy and ACL revision; degenerative arthritis and avascular necrosis of the bilateral hips; tendinosis and joint arthropathy

of the bilateral shoulders; bipolar disorder; major depressive disorder; intermittent explosive disorder; antisocial personality disorder; and polysubstance dependence. (Tr. 12-13). At Step Three, the ALJ found that Tyler's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment. (Tr. 13-15).

The ALJ then assessed Tyler's residual functional capacity ("RFC"), concluding that he is capable of performing the full range of sedentary, unskilled work. (Tr. 15-21). At Step Four, the ALJ determined that Tyler is unable to perform his past relevant work as a truck driver. (Tr. 21). At Step Five, the ALJ concluded, based on application of the Medical-Vocational Guidelines, that Tyler was capable of performing a significant number of jobs in the national economy and, thus, he is not disabled under the Act. (Tr. 21-22).

### E.   Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)

(internal quotations omitted).   In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

**F.     Analysis**

*1.     The ALJ's Step Two Analysis*

As set forth above, the ALJ found that Tyler has the severe impairments of status post right knee arthroscopy and ACL revision; degenerative arthritis and avascular necrosis of the bilateral hips; tendinosis and joint arthropathy of the bilateral shoulders; bipolar disorder; major depressive disorder; intermittent explosive disorder; antisocial personality disorder; and

17

polysubstance dependence.  (Tr. 12-13).  However, he also found that Tyler's stomach problems, twisted bowel syndrome, left ulnar nerve release, encephalopathy, and West Nile virus do not constitute severe impairments under the Act.  (*Id.*).  In his motion for summary judgment, Tyler argues that the ALJ erred in finding these conditions non-severe.  (Doc. #12-1 at 6).

As an initial matter, even if the ALJ erred in this respect, such an error would be harmless.  As the ALJ noted in his decision, at Step Two he was required to determine whether Tyler has "**a** medically determinable impairment that is 'severe' or a combination of impairments that is 'severe.'"  (Tr. 11) (citing 20 C.F.R. §416.920(c)) (emphasis added).  Thus, the ALJ's finding that Tyler suffers from severe physical and mental impairments (including status post right knee arthroscopy and ACL revision, degenerative arthritis and AVN of the bilateral hips, tendinosis and joint arthropathy of the bilateral shoulders, bipolar disorder, major depressive disorder, intermittent explosive disorder, antisocial personality disorder, and polysubstance dependence) was all that was required for him to progress to Step Three.  *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (the Secretary's failure to find that claimant's cervical condition constituted a severe impairment did not constitute reversible error where he found the existence of other severe impairments and proceeded to Step Three).  This legal principle is aptly explained in *Maziarz.*

In *Maziarz*, the plaintiff allegedly suffered from various impairments.  At Step Two, the Secretary found that Maziarz's heart conditions constituted a "severe" impairment under the regulations, but did not find his alleged cervical condition to be "severe."  *Id.* at 242, 244.  Ultimately, the Secretary found Maziarz not disabled.  Maziarz argued on appeal that the Secretary erred by not finding his cervical condition to be severe.  *Id.* at 244.  The Sixth Circuit rejected that argument, holding that because the Secretary had found at least one other "severe"

18

limitation, the severity of Maziarz's cervical condition was irrelevant to the Step Two analysis:

> According to the regulations, upon determining that a claimant has one severe impairment, the Secretary must continue with the remaining steps in his disability evaluation as outlined above. In the instant case, the Secretary found that Maziarz suffered from the severe impairment of [heart disease]. Accordingly, the Secretary continued with the remaining steps in his disability determination. Since the Secretary properly could consider claimant's cervical condition in determining whether claimant retained sufficient residual functional capacity to allow him to perform substantial gainful activity, the Secretary's failure to find that claimant's cervical condition constituted a severe impairment could not constitute reversible error.

*Id.* at 244. In other words, once the ALJ finds a severe impairment at Step Two, he moves on to the remaining sequential steps where he considers the claimant's severe and non-severe impairments. *Id. See also Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008); *Fisk v. Astrue*, 253 F. App'x 580, 584 (6th Cir. 2007) (noting that once the ALJ determines at least one severe impairment, he "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe'") (citing *Soc. Sec. Rul.* 96-8p, 1996 WL 374184, at *5 (July 2, 1996); *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003). That is exactly what took place here, where the ALJ found Tyler had certain "severe" impairments, then proceeded to the next sequential steps in the disability analysis. (Tr. 12-13). Accordingly, the ALJ's finding that some of Tyler's impairments were not severe cannot be grounds for remand.

Moreover, the ALJ did not err in finding Tyler's twisted bowel syndrome, elbow condition, or encephalopathy to be non-severe. The applicable regulations generally define a "severe" impairment as an "impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities . . . ." 20 C.F.R. §416.920(c). Basic work activities are defined as "the abilities and aptitudes necessary to do

19

most jobs." 20 C.F.R. §416.921(b).  Examples include:  (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.  *See id.*

In this case, the ALJ provided specific reasons for finding that not all of Tyler's impairments were "severe."  With respect to Tyler's stomach problems/twisted bowel syndrome, Tyler had an exploratory laparotomy with reduction of internal hernia and closure of mensenteric defect on January 15, 2009.  (Tr. 235).  However, the ALJ noted that he did not have any complications from this surgery, was ambulatory on discharge, and did not have any stomach complaints or treatment for stomach problems after that time.  (Tr. 12, 237).  Thus, the ALJ reasonably determined that Tyler's stomach problems/twisted bowel syndrome resolved with treatment and did not impose more than minimal functional limitations on his ability to work. (Tr. 12).  Similarly, the ALJ noted that the record does not contain any complaints of numbness in Tyler's left hand after he underwent ulnar release surgery in November 2008.  (*Id.*).  As a result, the ALJ reasonably found that this impairment was not severe.  And, with respect to Tyler's encephalopathy/West Nile virus, the ALJ noted that he was hospitalized for three days in September 2010, during which time his condition improved with treatment.  (Tr. 13).  Because this condition did not last for a continuous twelve month period, the ALJ reasonably determined that it was not a severe impairment.  *See* 42 U.S.C. §1382c(a)(3)(A).  Tyler has not offered any specific arguments challenging the ALJ's findings and, in fact, has done nothing more than assert in conclusory fashion that these impairments were severe.  As such, Tyler has failed to establish that his stomach problems/twisted bowel syndrome, elbow problems, or encephalopathy/West

Nile virus significantly limit any basic work activity, and the ALJ's conclusion that these conditions are non-severe is supported by substantial evidence.

### 2.    The ALJ's Evaluation of the Treating Physician Opinions

In his motion, Tyler also argues that the ALJ erred in giving "little weight" to the opinions of his treating physicians, Dr. Kelly and Dr. Han.   An ALJ "'must' give a treating source opinion controlling weight if the treating source opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'"   *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (internal quotations omitted).   If the ALJ declines to give a treating physician's opinion controlling weight, he must document how much weight he gives it, "considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician."   *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)); *see also* 20 C.F.R. §416.927(c).   In addition, the treating source rule contains a procedural, explanatory requirement that an ALJ give "good reasons" for the weight given a treating source opinion.   *See Wilson v. Comm'r of Soc. Sec.*, 2012 WL 6737766, at *8 (E.D. Mich. Nov. 19, 2012); *Soc. Sec. Rul.* 96-2p, 1996 WL 374188, at *5 (July 2, 1996) (providing that a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record").   As the Sixth Circuit explained, the purpose of this procedural requirement is two-fold:

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision

21

is supplied. The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.

*Wilson*, 378 F.3d at 544 (internal quotations and citations omitted).

In this case, Tyler's treating physician, Dr. Kelly, completed a Medical Source Statement on October 22, 2009,[11] in which he opined that Tyler could lift less than ten pounds; stand and/or walk for less than two hours in an eight-hour workday; and sit for less than six hours in an eight-hour work day (alternating between sitting and standing). (Tr. 391-92). In addition, Dr. Kelly opined that Tyler was limited in pushing and pulling with his upper and lower extremities, and could never climb, balance, kneel, crouch, crawl, stoop, or reach. (Tr. 392-93). In his motion, Tyler argues that the ALJ erred in giving "little weight" to this opinion. (*Id.* at 10-11). The Court finds merit to this argument.

The reasons articulated by the ALJ for giving "little weight" to Dr. Kelly's October 22, 2009 opinion are not supported by substantial evidence. First, the ALJ rejected Dr. Kelly's opinion that Tyler could lift less than ten pounds because Tyler "testified at the hearing that he could lift ten pounds." (Tr. 20). Although the ALJ's analysis seems to split hairs, this distinction might not warrant remand if the ALJ made no other errors in considering Dr. Kelly's opinion. However, the ALJ also rejected Dr. Kelly's opinion because, "On February 19, 2009, [Tyler] was only restricted to no lifting greater than fifteen pounds." (*Id.*). This statement, while

---

[11] The ALJ also noted that Dr. Kelly expressed two other "opinions" regarding Tyler's ability to work. (Tr. 20). On December 16, 2008, Dr. Kelly indicated that Tyler was "unable to work," pending his ACL reconstruction surgery, which was scheduled for December 22, 2008. (Tr. 335). And, in Dr. Kelly's September 2, 2010 progress notes, he characterized Tyler as "medically disabled." (Tr. 398). The ALJ declined to give either of these "opinions" controlling weight, as they went to "the ultimate finding of disability." (Tr. 20). This was not erroneous. *See Soc. Sec. Rul.* 96-5p, 1996 WL 374183, at *2 (July 2, 1996) ("[T]reating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance."). However, the Court does find error in the ALJ's consideration of Dr. Kelly's October 22, 2009 opinion.

perhaps factually accurate, ignores numerous facts in the record establishing that between February 19, 2009 (the date of the fifteen-pound lifting restriction), and October 22, 2009 (the date of Dr. Kelly's opinion), Tyler's physical conditions worsened and medical tests provided greater information regarding his symptomology.  For example, during this eight-month window, Tyler (1) had an MRI of his left shoulder, which revealed an "inferior labral tear"; (2) underwent right ACL revision surgery; and (3) was diagnosed with bilateral AVN.  (Tr. 261, 293, 315).  Thus, it certainly stands to reason that Dr. Kelly would believe Tyler could lift less weight in October 2009 than he could in February 2009, and the ALJ's decision to discount Dr. Kelly's opinion on the basis of this purported inconsistency is not supported by substantial evidence.

Additionally, the ALJ discounted Dr. Kelly's opinion that Tyler would have difficulties using his upper extremities "due to ligament tear of [his] bilateral shoulder" because "the latest MRI scans of [Tyler's] bilateral shoulders performed on May 7, 2009, did not show any evidence of tearing."  (Tr. 20).  This is simply incorrect.  Tyler did not undergo MRIs of his shoulders on May 7, 2009; rather, Dr. Kelly's progress notes from that date indicate that he reviewed Tyler's April 29, 2009 MRI results and that his *right* shoulder demonstrated no labral tearing.  (Tr. 263).  In these same notes, however, Dr. Kelly indicated that Tyler's left shoulder "demonstrated evidence of small labral cysts," which, according to the MRI results themselves, was "presumptive evidence [of] an inferior labral tear."  (Tr. 263, 325).  Thus, the ALJ relied on a faulty interpretation of both Dr. Kelly's treatment notes and the underlying MRI results in rejecting the limitations imposed by Dr. Kelly with respect to Tyler's upper extremities.

Given the fact that the ALJ relied on several improper interpretations of the medical evidence in discounting the opinion of Dr. Kelly, Tyler's treating physician, the Court cannot conclude that his decision to give Dr. Kelly's opinion "little weight" is supported by substantial

evidence.  As a result, the ALJ's findings as to Tyler's physical RFC are not supported by substantial evidence.

Tyler also challenges the ALJ's decision to give "little weight" to the August 9, 2010 opinion of his treating psychiatrist, Dr. Han.  (Doc. #12-1 at 10-11).  Dr. Han diagnosed Tyler with major depression, attention deficit hyperactivity disorder, panic disorder, and obsessive-compulsive disorder.  (Tr. 359).  He also opined that Tyler was markedly limited in the ability to understand, remember, and carry out detailed instructions and to respond appropriately to work pressures in a usual work setting.  (Tr. 357-58).  The ALJ discounted Dr. Han's opinion, in part, because progress notes from a September 1, 2009 counseling session indicate that Tyler was "doing okay" with medication.  (Tr. 20, 354).  However, the ALJ ignores the fact that, at his previous appointment, on August 11, 2009, Tyler indicated that "he is not doing okay" and has "multiple problems."  (Tr. 355).  And, at subsequent mental health sessions in 2010, he was diagnosed with bipolar disorder and reported continued depression, anxiety, panic attacks, and mood swings.  (Tr. 368, 374).  Yet, rather than acknowledging and addressing this potentially conflicting evidence, the ALJ failed to mention or address these competing findings.  While the ALJ need not address every piece of evidence in the record, *Kornecky*, 167 F. App'x at 508, he does not fairly discharge his duties when he fails to discuss significant contradictory portions of the very records on which he relies the most.  *See Minor v. Comm'r of Soc. Sec.*, 2013 WL 264348, at *17 (6th Cir. Jan. 24, 2013).  On remand, the ALJ should reconsider Dr. Han's opinion in light of the other record evidence and provide good reasons, supported by substantial evidence, for the weight he assigns to it.

### 3.   Tyler's Remaining Arguments

Tyler raises several other arguments before this Court.  Specifically, he argues that (1) the ALJ erred in failing to "do a function by function analysis of [his] residual functional capacity,"

24

(2) the ALJ did not adequately account for his mental limitations in concluding that he retained the mental RFC to perform unskilled work; and (3) the ALJ erred at Step Five of the sequential evaluation in relying upon the medical-vocational guidelines (the "grids") to determine that he was capable of performing a significant number of jobs that exist in the national economy.  (Doc. #12-1 at 7-10).  Because the Court finds that the ALJ erred in weighing the opinions of Tyler's treating physicians, and that, as a result, his RFC finding is deficient, it need not specifically address these arguments herein.  On remand, however, the ALJ should ensure that he provides a proper RFC analysis, which adequately discusses Tyler's ability to perform sustained work-related activities, both from a physical and a mental perspective.  In addition, the Court notes that, given Tyler's significant exertional and nonexertional limitations, it would seem prudent on remand for the ALJ to elicit testimony from a VE regarding the effect of Tyler's impairments on the applicable occupational base.[12]

Finally, Tyler argues in his reply brief – apparently pursuant to sentence six of 42 U.S.C. §405(g) – that the Court should remand the case to the ALJ for consideration of additional evidence submitted to the Appeals Council.  (Doc. #15 at 2-3).  Specifically, Tyler argues that the three exhibits which were not submitted at the administrative hearing – and which include MRI results, EMG results, and an operative report from Tyler's spinal fusion surgery – further establish that the ALJ erred in formulating Tyler's RFC.  (*Id.* (citing Tr. 479-504)).  Because the Court has already found remand appropriate pursuant to sentence four of 42 U.S.C. §405(g), it need not determine whether Tyler has satisfied the factors required for a sentence six remand. The Court notes, however, that given the significance of these additional records and the fact that they were not available at the time of the prior administrative hearing, the ALJ should

---

[12] As noted above, the ALJ called the VE to testify as a witness but then asked her only one question (regarding Tyler's past relevant work).  (Tr. 48).

specifically consider and explain their relevance on remand.

## III.    CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [14] be DENIED, Tyler's Motion for Summary Judgment [12] be GRANTED IN PART to the extent it seeks remand and DENIED IN PART to the extent it seeks an award of benefits, and that this case be remanded to the ALJ for further proceedings consistent with this Recommendation.


Dated: December 3, 2013                    s/David R. Grand
Ann Arbor, Michigan                         DAVID R. GRAND
                                            United States Magistrate Judge

## <u>NOTICE</u>

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 3, 2013.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager